UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LAWRENCE M. BECKER,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>CARMEN STEPHANIE MAYS-WILLIAMS and ASA WILLIAMS JR.,<br><br>　　　　　　　Defendants. | CASE NO. C11-5830 BHS<br><br>DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW |

This matter comes before the Court on a bench trial conducted on January 19, 2016. Having considered the testimony of the witnesses at trial, the exhibits admitted into evidence at trial, the parties' post-trial briefs, and the reminder of the file herein, the Court enters the following decision, findings of fact, and conclusions of law.

**I. DECISION SUMMARY**

The Court has been called upon to resolve a dispute between Asa Williams Sr.'s ("Asa Sr.") son, Asa Williams Jr. ("Asa Jr."), and Asa Sr.'s former wife, Carmen Stephanie Mays-Williams ("Carmen"). The question before the Court is whether Asa Jr. or Carmen is the legal beneficiary to benefits Asa Sr. earned through his employment with Xerox Corporation ("Xerox"). These benefits consist of the Xerox Retirement

1  Income Guarantee Plan ("RIGP") and the Xerox Savings Plan ("Savings Plan")
2  (collectively "the Plans"), both of which are subject to the Employee Retirement Income
3  Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. The dispute began in this
4  Court through an interpleader action initiated by Lawrence Becker, the fiduciary of the
5  Plans.

6  **A.     Legal Framework**

7       To resolve this dispute, the Court first looks to the guidance provided by the Ninth
8  Circuit in *Becker v. Williams*, 777 F.3d 1035 (9th Cir. 2015). The panel remanded for the
9  Court to determine whether Asa Sr. "strictly or substantially complied with the governing
10 plan documents." *Id.* at 1041. The panel further explained that this inquiry was governed
11 by state law, and implicated Asa Sr.'s intentions. *Id.*

12      The panel concluded that the plan administrator, by filing this interpleader action,
13 had not been able to determine whether Asa Sr. complied with the governing plan
14 documents:

15 > [R]ather than award benefits to Carmen due to Asa, Senior's alleged failure to return the signed beneficiary forms, the plan administrator declined to award benefits to either party, and instead chose to file this present interpleader action. Thus the plan administrator impliedly *declined* to exercise any discretion in determining whether Asa, Senior's telephonic designation of Asa, Junior, as beneficiary was valid under the plan. . . .
>        Thus, as there has been no exercise of discretion to which we could defer, we review de novo whether Carmen or Asa, Junior, is entitled to plan benefits—a question answered by reference to the governing plan documents. *See Thomas v. Or. Fruit Prods. Co.*, 228 F.3d 991, 993 (9th Cir. 2000); *see also Liberty Life*, 358 F.3d at 1299 (applying de novo review when the plan administrator declined to exercise its discretionary authority to interpret benefit eligibility).
>        The inquiry thus is whether Asa, Senior, strictly or substantially complied with the governing plan documents. *See BankAmerica Pension*

ORDER - 2

1  *Plan v. McMath*, 206 F. 3d 821, 830 (9th Cir. 2000). Such an inquiry is one of state law, *see id.*, and one that implicates Asa, Senior's intentions, *see,
2  e.g.*, *Sun Life Assurance Co. of Canada v. Sutter*, 95 P.2d 1014, 1016 (Wash. 1939) ("[I]n cases in which the insurer is not interested, the intent
3  of the insured is entitle to great consideration").

4  *Id.*

5  Throughout this litigation, Asa Jr. has held steadfast to his position that Asa Sr.
6  strictly complied with the plan documents because the Ninth Circuit held that "the
7  governing plan documents permit unmarried participants to change their beneficiary
8  designations by telephone." *Id.* The Court agrees with Asa Jr. to the extent that
9  telephone calls may be permitted because the governing plan documents provide that Asa
10 Sr. may change his beneficiary. *See* Trial Ex. A-1 § 7.4 ("An unmarried
11 Member . . . may change his designation of beneficiary from time to time."); Trial Ex. A-
12 2 § 10.01 ("An unmarried Participant . . . may change his designation of beneficiary from
13 time to time.").

14 The Plans, however, fail to provide any mechanism for *how* such a change may or
15 should be made. Put another way, the governing plan documents are so equivocal that
16 unmarried participants could change their beneficiaries by email, carrier pigeon,
17 messages in a bottle, or any other form of communication. *Riordan v. Commonwealth
18 Edison Co.*, 128 F.3d 549, 552 (7th Cir. 1997) ("In circumstances where a plan provides
19 liberal mechanisms for changing beneficiaries . . . , 'strict' enforcement means allowing
20 participants to do exactly that."). Thus, the problem with Asa Jr.'s position is not the
21 type of communication, but rather the *lack* of any clear and unequivocal communication,
22 as more thoroughly explained below.

In the absence of strict compliance, Washington courts follow the guidance set forth by the Washington Supreme Court in *Williams v. Bank of California, N.A.*, 96 Wn.2d 860, 866 (1982):

> The rule requiring substantial compliance with the policy terms in effectuating a change of beneficiary becomes necessary for the purpose of demonstrating with a high degree of certainty that the deceased insured unequivocally desired to make that change, and that he did not some time thereafter abandon his purpose by failing to take affirmative steps to carry out his intent.

Substantial compliance is therefore the appropriate standard for this case. In Washington, "[s]ubstantial compliance with the terms of the policy means that the insured has not only manifested an intent to change beneficiaries, but has done everything which was reasonably possible to make that change." *Allen v. Abrahamson*, 12 Wn. App. 103, 105 (1974).

It is within this legal framework that the Court considers the evidence presented at trial.

**B.     Evidence at Trial**

During trial, Asa Jr. presented documentary evidence and witness testimony through cross-examination to support his contention that Asa Sr. either strictly or substantially complied with the term of the plans. Asa Jr. failed to meet his burden for several reasons.

First, Asa Jr. failed to establish that Asa Sr. was the individual who called Xerox to change the beneficiary designation. It is undisputed that someone called Xerox, but Asa Jr. failed to sufficiently establish that Asa Sr. was the caller. For example, Asa Jr.

did not submit evidence to establish the phone number of the individual that called Xerox. Without additional supporting evidence, the Court cannot assume that simply because calls were made by someone purporting to be Asa Sr. that those calls were actually made by Asa Sr. In today's world, we see the nearly ubiquitous use of security measures—such as codes and personal identifying information—to avoid fraudulent transactions. Based on the evidence presented at trial, it is unclear whether Xerox consistently employed such measures in this case. In fact, Xerox's internal notes from the contact in July 2007 show that Asa Sr. did not have a username or password to update his beneficiary online. *See* Trial Ex. A-11. With or without the use of identifying information over the phone, it is reasonable for Xerox to require written verification of the designation change to avoid fraudulent transactions.

Second, after each of the three phone calls, Xerox sent Asa Sr. an authorization form, asking Asa Sr. to "validate" the beneficiary change requested in the phone call. Trial Exs. 13, 14, 18, 19. With regard to the first two times the forms were sent, Asa Sr. did not sign, date, and return the forms. As for the third time, the forms were returned unsigned and/or undated. Trial Exs. 20, 21. Xerox subsequently sent Asa Sr. two letters on February 1, 2011. Trial Exs. 20, 21. The letters informed Asa Sr. that he failed to sign and/or date the authorization forms, and therefore his beneficiary designation could not be considered valid. Trial Exs. 20, 21. The letters further informed him that if a new authorization form was not signed, dated, and returned, the beneficiary change would not be considered valid. Trial Exs. 20, 21. Asa Sr. did not return any document after the February 1, 2011 letters. He died on May 16, 2011. The Court is unable to find that Asa

Sr.'s repeated failure to return a properly completed authorization form was anything but the product of an intentional and conscious decision.

When confronted with the fact-specific inquiry of determining a deceased's intent, the failure to complete simple, mundane tasks undermines Asa Sr.'s alleged unequivocal desire to change his beneficiary. Even if it was established that Asa Sr. at some point expressed a desire to change his beneficiary, the very fact that he allegedly called three times, was told to sign and return an authorization form three times, and failed to return a properly completed authorization form three times, is compelling evidence that Asa Sr. ultimately did not want to change his beneficiary. Indeed, under the circumstances presented in this case, it is just as reasonable—if not more reasonable—to conclude that Asa Sr. did not make the calls as it is to conclude that he did. It is also just as reasonable to infer that even if Asa Sr. was the caller, his failure to return a signed authorization form demonstrates that he did not, in fact, wish to change his beneficiary. While the last alleged attempt to change the beneficiary resulted in a partially completed and returned authorization form, the fact that the form was unsigned leads to as reasonable an inference that someone other than Asa Sr. mailed it as it is to infer that Asa Sr. did. No evidence was presented as to why Asa Sr. failed to comply with the plan administrator's directives when Asa Sr. did not die for more than three months after he was reminded by Xerox what he must do to effectuate the beneficiary change.

Third, substantial and credible evidence was presented showing that Asa Sr. would not have made the alleged change of removing Carmen in favor of Asa Jr. The

uncontroverted evidence the Court accepts as credible and proven consists of the following:

1. Carmen provided health care assistance to Asa Sr. and was instrumental in getting him into a kidney transplant program, which helped him live for several more years.

2. Carmen and Asa Sr. had a good relationship after their divorce in 2007 and during his final years.

3. During the time of the alleged beneficiary designation, Carmen was still raising and supporting Asa Sr.'s two nephews that he and Carmen had adopted.

4. Asa Sr. had an egalitarian view toward parenting his nine children, which would be inconsistent with Asa Sr. designating only one of his children as his beneficiary under the Plans.

5. Asa Sr. named all nine children in his Last Will and Testament.

6. Asa Sr. and Asa Jr. had an estranged relationship during much of the post-divorce period. Even in 2004—when Asa Sr. had been hospitalized and close to death in North Carolina—Asa Jr., having been informed that his father was very ill, did not contact him.

7. In 2001, Asa Jr. and Asa Sr. had an altercation in which Asa Sr. was injured and had to go to the hospital. Although counsel for Asa Jr. attempted to impeach Carmen's testimony by suggesting she was unable to observe Asa Jr. as the aggressor, the Court finds that she heard the altercation, she was called to come by Asa Sr. to the garage, and she went into the garage and saw Asa Sr. on the floor bleeding while Asa Jr. fled the scene. During Carmen's marriage to Asa Sr., Asa Jr. never came to the home after that altercation. The only conversation Asa Jr. had with Carmen after the altercation was the call she made to him in 2004, in which she asked Asa Jr. to come see his father who was not expected to live much longer.

Apart from the evidence of the purported but unsubstantiated calls by Asa Sr. to Xerox, the returned but unsigned and/or undated authorization form, and the divorce proceedings, the only other evidence presented by Asa Jr. was the July 2007 divorce

1  decree that awarded the Plans to Asa Sr.  *See* Trial Ex. 12.  The divorce decree, however,

2  is not dispositive.  First, the divorce decree was not a Qualified Domestic Relations Order

3  ("QDRO"), and therefore is not controlling.  *See Kennedy v. Plan Adm'r for DuPont Sav.*

4  *& Inv. Plan*, 555 U.S. 285 (2009).  Second, even though Asa Sr.'s attorney notified Asa

5  Sr. about the importance of removing Carmen as his beneficiary as soon as possible after

6  the divorce, Trial Ex. A-14, Asa Sr. did not sign, date, and return the three sets of

7  authorization forms.  Finally, in the years following the divorce, Carmen and Asa Sr. had

8  an ongoing positive relationship.

9        As argued by Carmen, there is no evidence that Asa Sr. ever contested or

10 questioned Xerox's requirement that he must sign, date, and return the authorization form

11 in order to effectuate the beneficiary change.  It is more likely than not that Asa Sr.

12 believed that by not doing so his beneficiary designation would remain unchanged.

13       Suppose, on the other hand, the Court was required to ignore all of this evidence,

14 as urged by Asa Jr., and look only to the phone calls allegedly made by Asa Sr.  Assume

15 also that after making these calls and being told that in order to effectuate his intent, Asa

16 Sr. was required to sign, date, and return an authorization form.  Also assume there was a

17 written reminder that the returned form was undated and/or unsigned, and therefore

18 invalid.  Finally, assume Asa Sr. reasonably relied upon these directions and, having

19 changed his mind, rested in the assurance that his beneficiary would remain unchanged.

20 Under all these assumptions, it is not a just result that Asa Sr.'s prior direction be

21 thwarted by equivocal intentions.  In other words, Asa Sr.'s repeated failures over the

22

course of four years evidences an intent *not* to fully and finally change his beneficiary designations.

Ultimately, Asa Jr. has failed to meet his burden of proving that Asa Sr. strictly or substantially complied with the governing plan documents in order to change the beneficiary of the Plans. Asa Jr. has not proven that Asa Sr. unequivocally manifested an intent to change his beneficiary nor proven that Asa Sr. did all that was reasonably possible to do to effectuate a change. Therefore, the designation naming Carmen controls and she is entitled to be paid the benefits.

In addition to the forgoing, the Court makes the following findings of facts and conclusions.

## II. FINDINGS OF FACT

1. Asa Sr. and Carmen knew each other for many years before they married in 1993. Asa Sr. had a significant alcohol problem before they married, and Carmen helped Asa Sr. obtain treatment for his alcohol addiction. By the time they married, Asa Sr. had successfully completed alcohol treatment.

2. When Asa Sr. married Carmen in 1993, he designated her as the beneficiary of the Plans by signing, dating, and returning a form to Xerox. Trial Ex. A-8.

3. Asa Sr. and Carmen had a large blended family of nine children. Asa loved all of his children equally. Asa Sr. named all nine children in his Last Will and Testament, which was prepared in June 2000. Trial Ex. A-4.

4. In 2000, Asa Sr. and Carmen lived in Sacramento, California. That year, Asa Sr. learned he had advanced Hepatitis C. In January 2001, Asa Sr. learned he had

liver cancer, which was inoperable and would soon be fatal. Carmen researched liver transplant programs in the United States, and helped convince a program at the University of North Carolina to accept Asa Sr. As a condition of being accepted into the program, Asa Sr. had to move to North Carolina.

5. In February 2001, Asa Jr. visited Asa Sr. and Carmen's home for the first time since they were married. The visit went poorly and culminated with Asa Jr. punching Asa Sr. in the face, causing significant injury to Asa Sr. and a trip to the emergency room for stitches. The February 2001 visit was the last time that Asa Jr. visited Asa Sr. and Carmen at their home.

6. In April 2002, Asa Sr. and Carmen moved from California to North Carolina so that Asa Sr. could receive a liver transplant at the University of North Carolina.

7. In May 2003, Asa Sr. had the liver transplant. Following the transplant, Asa Sr. suffered from kidney failure and continued to have significant medical challenges. He remained on kidney dialysis for the rest of his life. Carmen took care of Asa Sr. and supported his recovery.

8. In October 2004, Asa Sr. retired from Xerox.

9. In 2005, Asa Sr. moved to Vancouver, Washington.

10. Carmen filed for divorce in North Carolina.

11. In 2007, Asa Sr. and Carmen agreed to dismiss the first divorce proceeding and file a new proceeding that would not be contested by either of them. As they agreed,

1  Asa Sr. filed a new divorce proceeding in April 2007.  Trial Ex. 12.  Carmen did not

2  appear.  *Id.*

3        12.    Asa Sr. and Carmen's divorce was finalized in July 2007.  *Id.*  Their

4  divorce decree did not provide for any property settlement, *see id.*, and was not a QDRO.

5        13.    Having worked with Asa Sr. during the divorce proceeding, it was

6  Carmen's impression that he was grateful she had worked to find a liver transplant

7  program for him, she had taken good care of him, and she was continuing to raise their

8  two adopted sons, even if he was not.  It was also Carmen's impression that Asa Sr.

9  intended for her to remain the beneficiary of the Plans based on their history together and

10 shared egalitarian views towards their nine children.

11       14.    After their divorce in July 2007, Asa Sr. and Carmen regained their

12 friendship and maintained a cordial, congenial, and respectful relationship as they worked

13 together to raise their two nephews, who Asa Sr. and Carmen had adopted and who

14 remained in Carmen's custody.  Asa Sr. and Carmen frequently talked on the phone and

15 were in regular communication.  Their communications were pleasant and friendly.  They

16 cared about each other and the divorce did not change that.

17       15.    Both before and after the divorce, Asa Sr. regularly received mail at his

18 home in Vancouver, Washington.  He regularly responded and signed documents as

19 requested, including requests from his attorney.

20       16.    On July 16, 2007, after the divorce was final, Asa Sr.'s attorney contacted

21 Xerox about changing Asa Sr.'s beneficiary.  Trial Ex. A-14.  Asa Sr.'s attorney asked a

22

Xerox representative to contact Asa Sr. about how to proceed with changing the beneficiary on his retirement account. *Id.*

17. Asa Sr.'s attorney also sent a letter to Asa Sr. at his home in Vancouver, Washington. *Id.* The letter notified Asa Sr. that Xerox would contact him about how to change his beneficiary. *Id.* The letter also advised Asa Sr. about the importance of removing Carmen as his beneficiary as soon as possible. *Id.*

18. On July 17, 2007, a Xerox representative called Asa Sr. Trial Ex. A-11. Because Asa Sr. did not have a username or password to update his beneficiary online, Asa Sr. needed to change his security information and then call Xerox back. *Id.*

19. Two hours later, an individual purporting to be Asa Sr. called Xerox about changing his beneficiary of the RIGP. *Id.* The Xerox representative informed the caller that he needed to sign, date, and return an authorization form to complete the beneficiary change. *Id.*

20. On July 18, 2007, Xerox sent a beneficiary authorization form to Asa Sr.'s home in Vancouver, Washington. Trial Ex. 13. The form states that Asa Sr. must sign, date, and return the form in order to validate his beneficiary designation. *Id.* The parties do not contest whether Asa Sr. received this form.

21. Asa Sr. did not sign, date, or return the beneficiary authorization form, and Xerox did not change Asa Sr.'s beneficiary designation.

22. On February 29, 2008, an individual purporting to be Asa Sr. called Xerox and asked to change his beneficiary of the RIGP to Asa Jr. *See* Trial Ex. 14.

23. On March 3, 2008, Xerox sent a beneficiary authorization form to Asa Sr.'s home in Vancouver, Washington. *Id.* The form states that Asa Sr. must sign, date, and return the form in order to validate his beneficiary designation. *Id.* The parties do not contest whether Asa Sr. received this form.

24. Asa Sr. did not sign, date, or return the beneficiary authorization form, and Xerox did not change Asa Sr.'s beneficiary designation.

25. On January 10, 2011, an individual purporting to be Asa Sr. called the Xerox Benefits Center and stated he wanted Asa Jr. to be listed as his beneficiary of the Plans. *See* Trial Ex. 15.

26. During the phone call, the Xerox representative acknowledged that Asa Sr. and Carmen were no longer married and informed the caller that he needed to sign and return two authorization forms. *Id.* The caller did not contest or question the instruction that the forms needed to be signed and returned. *Id.*

27. On January 11, 2011, Xerox mailed two beneficiary authorization forms to Asa Sr. Trial Exs. 18, 19. The parties do not contest whether Asa Sr. received these forms.

28. The forms were returned to Xerox unsigned and/or undated, and Xerox did not change Asa Sr.'s beneficiary designation. Trial Exs. 20, 21.

29. On February 1, 2011, Xerox mailed two letters to Asa Sr. Trial Exs. 20, 21. The letters notified Asa Sr. that his beneficiary designations "cannot be considered valid" until he signed, dated, and returned the authorization forms. Trial Exs. 20, 21. The parties do not contest whether Asa Sr. received these letters.

30.     Asa Sr. did not respond to the letters.

31.     No persuasive evidence was presented that the caller to the Xerox Benefits Center was Asa Sr.

32.     Asa Sr. was repeatedly informed that he must sign, date, and return the authorization forms in order to complete a change of beneficiary.  Although these forms are not governing plan documents, Asa Sr.'s repeated failure to complete the simple task of signing and returning the forms demonstrates that it was not Asa Sr.'s unequivocal desire to change his beneficiary.

33.     The unrefuted testimony of Andrea Elliott, coupled with the distribution set forth in Asa Sr.'s will, credibly establishes that Asa Sr. would not have preferred one child (Asa Jr.) over his eight other children in selecting a beneficiary for the Plans.

34.     Asa Sr. died on May 16, 2011, in Vancouver, Washington.

### III. CONCLUSIONS OF LAW

1.     The Court has jurisdiction under 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331.

2.     This is an interpleader action.  Interpleader actions "developed in equity and [are] governed by equitable principles." *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030, 1033–34 (9th Cir. 2000).

3.     The Plans are "employee benefit plans" under ERISA.  29 U.S.C. § 1002(3).

4.     Asa Sr. was a "participant" of the Plans.  *Id.* § 1002(7).

5.     The Plans provide that an unmarried participant "may change his designation of beneficiary from time to time."  Trial Ex. A-1 § 7.4; *see also* Trial Ex. A-2

1  § 10.01. Neither the RIGP nor the Savings Plan contains specific requirements as to how
2  an unmarried participant, such as Asa Sr., may change his beneficiary.

3      6.     Although the Summary Plan Documents ("SPDs") state that unmarried
4  participants may call the Xerox Benefits Center to change their beneficiary designation at
5  any time, Trial Exs. A-1 & A-2, the SPDs are not governing plan documents. *See CIGNA*
6  *Corp. v. Amara*, 563 U.S. 421, 438 (2011) ("[T]he summary documents, important as
7  they are, provide communication with beneficiaries *about* the plan, but . . . their
8  statements do not themselves constitute the *terms*."). Thus, the statements in the SPDs do
9  not constitute the terms of the Plans.

10     7.     The plan administrator declined to exercise any discretion in determining
11 the beneficiary of the Plans, and instead filed this interpleader action.

12     8.     Under the doctrine of strict compliance, Asa Sr. could change his
13 beneficiary designation from time to time. *Riordan*, 128 F.3d at 552. Asa Jr., however,
14 failed to submit sufficient evidence to establish that Asa Sr. communicated a change of
15 beneficiary to Xerox. Therefore, the Court concludes that Asa Sr. did not strictly comply
16 with the liberal terms of the Plans.

17     9.     In the absence of strict compliance, the Court must assess whether Asa Sr.
18 substantially complied with the terms of the Plans. *Becker*, 777 F.3d at 1041.

19     10.     Substantial compliance is determined by the law of the forum state.
20 *BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 829–830 (9th Cir. 2000) (applying
21 California law). In Washington, "[s]ubstantial compliance with the terms of the policy
22 means that the insured has not only manifested an intent to change beneficiaries, but has

done everything which was reasonably possible to make that change." *Allen*, 12 Wn. App. at 105.

11. Asa Sr. and Carmen's 2007 divorce decree did not change the designation of Carmen as the beneficiary of the Plans. *See Kennedy*, 555 U.S. 285. The divorce decree was not a QDRO. Thus, any orders entered in the parties' divorce proceedings do not in and of themselves remove Carmen as the designated beneficiary of the Plans or otherwise demonstrate intent one way or the other.

12. Asa Jr. has failed to establish that Asa Sr. manifested intent to change his beneficiary and did everything reasonably possible to effect that intent.

13. Carmen is entitled to an order from this Court requiring Xerox to pay Carmen or her designee all proceeds of Asa Sr.'s RIGP and Savings Plan without further delay.

14. Attorney's fees and costs shall not be awarded to either party. The Court, however, will consider a motion from Carmen's counsel regarding the manner in which the proceeds should be distributed in light of possible tax implications or similar considerations.

Dated this 8th day of March, 2016.

BENJAMIN H. SETTLE
United States District Judge